[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This is an application for Post-Conviction Relief filed by Kevin O. Pezzucco pursuant to Section 10-9.1 R.I.G.L. In his application he alleges that on January 4, 1989 he unwillingly entered pleas of nolo contendere (factually, pleas of guilty) to three charges of unlawful delivery of cocaine to a police undercover agent because his trial counsel was not prepared for trial; that he was not permitted to obtain other counsel and because his trial counsel had advised him that the Court would impose a sentence of three (3) years.
The State, in answer to the Application has denied Pezzucco's allegations. Hearings were held; testimony and evidence taken, and after argument of counsel, decision reserved. Decision is now made and entered.
I
CASE TRAVEL — FACTS
In 1988, Kevin O. Pezzucco, hereinafter referred to as the "petitioner", was the target of a drug sale investigation being conducted by the Attorney General's Office Narcotic Drug Strike Force. The petitioner was described in one of the Strike Force reports as "probably one of the biggest dealers in East Greenwich." (Report of Detective G.F. Renn; September 5, 1988.State's Exhibit C.) The affidavit of Officer Robert J. Lemoi contained in the Information packet of K/288-607 is perhaps more detailed and indicative of what prompted the narcotic Drug Strike Force's investigation.
That affidavit reads in part as follows:
 "On 7 August 1988 the East Greenwich Police Department gained information which detailed extensive drug dealings in this town. The majority of the information related to Kent Auto Top Glass and its owner Kevin O. Pezzucco DOB 7/27/56. The business is located at 431 Main Street and has long been believed to be a major distribution point of cocaine in the Town of East Greenwich.
 The information received related that Pezzucco has been running a cocaine business both out of his shop and his home which is described in detail and located on Tower Hill Road in South Kingstown, R.I. Pezzucco is stated to receive a minimum of 1/2 key of cocaine weekly which he turns into a $10,000 profit. The information detailed his selling the cocaine from the shop to school friends of his and people on his softball team, then selling the rest out of his home after cutting it. He is stated to carry the cocaine in a green duffle bag in whatever vehicle he is operating (specifically R.I. reg. KPEZ, a maroon Lincoln or R.I. reg. M.V. 344, a silver blazer.) He is stated to keep scales used in measuring the cocaine in both his residence, and his business. It is stated that when in his home Pezzucco stores the duffle bag in a hallway closet."
In any event, on August 25, 1988, an undercover policeman with the assistance of a confidential informant was introduced to the petitioner and later that day the undercover policeman purchased 1/16 ounce of cocaine for $125.00 from the petitioner. The following day, August 26, 1988, the undercover policeman made another purchase of 1/4 ounce of cocaine from the petitioner for $475.00. One week later, on September 2, 1988, the undercover policeman purchased another 1/4 ounce of cocaine from the petitioner for $475.00. On the occasion of the September 2, 1988 cocaine purchase from the petitioner, it appears that the amicable relationship between petitioner and the undercover policeman having been established, the petitioner, believing he had a good customer, decided to cement that relationship. Petitioner gave the undercover policeman a Kent Auto Top business card and instructed him to call there for future cocaine need purchases. The petitioner even went so far as to tout the quality of his stock-in-trade by telling the undercover policeman that he only sold "pure stuff" and that he had a reputation for that quality type product. He also told the undercover policeman that he only sold the best . . . and "this stuff is pure". (Affidavitof Gregory P. Ursini — K2/88-607 Information packet)
On September 9, 1988 the Narcotic Drug Strike Force personnel requested and obtained a search warrant from the District Court authorizing the search of the petitioner's secluded South Kingstown rented residence ("the only house at the end of a long dirt driveway leading from Tower Hill Road) as well as the petitioner's business place, Kent Auto Top, on Main Street in East Greenwich. Those searches, the first at the petitioner's residence produced cocaine and marijuana and the usual other drug related items such as wrappings, cutting agents, plastic bags with narcotic residuals, etc., and of course, the green dufflebag containing a Deal-O-Gram scale. The search of the Kent Auto Top building produced a 22 caliber weapon, an OHAUS triple beam scale, money, banking papers, etc., but no narcotics.
As a result of the investigations and the searches, various narcotic violation charges were filed against the defendant. In South Kingstown he was charged with unlawful possession of cocaine and marijuana (W2/88-492) and in East Greenwich with the three previously noted sales of cocaine to the undercover policeman. (K2/88-607) The petitioner's present Application for Post-Conviction Relief is an outgrowth from the disposition of the East Greenwich cocaine sales charges which had evolved into Criminal Information K2/88-607. Petitioner in this proceeding seeks to have this Court vacate his previously entered guilty pleas to those three charges in Criminal Information K2/88-607 and the judgments of conviction and sentences imposed thereon set aside.
II
THE GUILTY PLEAS
The petitioner, as noted earlier, was arrested on September 11, 1988 and charged with the three cocaine sales made to the undercover policeman in East Greenwich. Following his arraignment and release on bail in the District Court, he was informed against by the Attorney General and on October 19, 1988 arraigned on Criminal Information K2/88-607 in the Kent County Superior Court. He entered pleas of not guilty; was released after posting $7,500.00 cash bail and a copy of the Information packet was given to his attorney at the arraignment along with the criminal trial scheduling form. He was represented then by Attorney Joseph Altieri. The criminal trial scheduling form notified the defendant and his attorney that the case would be pre-tried on November 14, 1988 and would be set down for trial calendar call on December 8, 1988. (See, case file K2/88-607).
On November 3, 1988 Attorney Altieri filed the usual motions to dismiss; suppress; discovery and inspection, etc. In all, six motions were filed.
On November 14, 1988 the pre-trial conference was held, as scheduled. The petitioner, while not present in Court Chambers, was present in the courthouse and available to his attorney, Mr. Altieri.
At the pre-trial conference, the state's prosecutor informed defense attorney Altieri and the Court that the State was particularly interested in obtaining petitioner's cooperation in its ongoing drug investigation. In return for that cooperation, the prosecutor stated that he was prepared to recommend concurrent fifteen year sentences on each of the three charges, with three years to serve, and twelve years suspended. That recommendation was conditioned, however, upon petitioner's cooperation in naming and identifying the source of his cocaine supply and agreeing to testify against that source, if that source were to be charged and tried. Defendant's attorney Altieri informed the prosecutor and the Court that he would discuss the State's offer with the petitioner, but that he was awaiting discovery returns from the State, and accordingly would like to have that discovery information to discuss with the petitioner. He requested that the case be further pre-tried on November 30, 1988. The case was continued to that date. One week later, on November 21, 1988 the State's discovery reply materials were mailed to Attorney Altieri. (See case file: K2/88-607) It would appear from the petitioner's testimony given during the hearings on his present Application for Post-Conviction Relief that Attorney Altieri did receive the State's discovery reply and did discuss those materials and information along with the State's November 14th proposition with him. Petitioner testified that he felt that the case was then getting "too big" for Attorney Altieri to handle and that he wanted new counsel. On November 29, 1988 Attorney John J. Kelly entered his appearance "asco-counsel and trial counsel" and also filed a Request for Production and a Motion to Continue the scheduled December 8, 1988 trial calendar call of the case because by previous order of the Presiding Justice, he had been excused from court attendance from December 8 through December 16, 1988. That motion was granted by the Court on November 30, 1988, at the previously requested and scheduled pre-trial conference. In granting the trial continuance, the Court specifically informed counsel of a definite trial date, January 4, 1989, being the first day of court business following the Christmas recess. The petitioner was present in the courthouse and the Court was informed by Attorney Kelly that he had discussed the State's previous cooperation recommendation offer with petitioner and that a meeting with East Greenwich Detective Renn had been set up for that day, November 30, 1988.
The petitioner, as previously noted, was present in the courthouse on November 30, 1988 with his sister, a friend of his and his mother. According to his testimony, given during the hearing on his Post-Conviction Application, he did attend that "cooperation" meeting. He testified here that he told Detective Renn at the meeting that he could not in detail recall his source of cocaine but that it was from a "Manny or Juan or Jose" — "two hispanics" in a bar near Roger Williams. Petitioner then testified that Attorney Kelly "yelled at him" and swore at him and told him that he was lying. Petitioner testified that at that point, he refused to give any further information because of what Kelly "put him through." Attorney Kelly also testified in this proceeding regarding that cooperation meeting. He denied swearing at petitioner, but corroborated in part what petitioner had to say about "Manny, Juan or Jose — two hispanics, etc." Attorney Kelly also testified that petitioner, told Detective Renn that the names of the suppliers were "Juan or Jose who were two latins-Columbians" and that the bar was "Pony Bar or something." Attorney Kelly also testified that Detective Renn and the prosecutor would not "buy the story."
The attorneys, Mr. Kelly and prosecutor Donnelly, informed the Court on November 30, 1988 that the cooperation meeting had been a total failure but did not in any manner explain why, or inform the Court of what had transpired. As a result, the Clerk was told by the Court to make a file entry on November 30, 1988 passing the case "for trial." That trial date was as previously noted, specially set for January 4, 1989. The petitioner in his testimony here has alleged that he was totally unaware of the fact that his case was definitely going to trial on January 4, 1989. He also testified that Attorney Kelly had not even spoken to him about the trial. Attorney Kelly in his testimony denied that the petitioner was unaware of what was going on. Attorney Kelly testified that he met and discussed the case and the trial date with the petitioner during the awaiting trial period of time, and also again on January 3, 1989, the day before the trial. Attorney Kelly also testified that he discussed again with the petitioner the State's recommended plea bargain cooperation offer and the information that the State wanted from the petitioner in return. Petitioner denies that. Petitioner's own witnesses, however, betray his denial and reveal him to be not truthful. Davida Pelosi, the defendant's sister, testified that Attorney Kelly came to her house on January 3, 1989 and there took petitioner into another room and spoke with the petitioner for about forty-five minutes. She testified that Attorney Kelly and her brother, the petitioner, talked about the case; plea bargaining and the information the police wanted from her brother.
Also, on January 3, 1989 petitioner telephoned attorney John F. Cicilline's office to retain Attorney Cicilline for the trial "on the fourth". Mr. Cicilline was away on vacation and as a result petitioner spoke with Attorney John M. Cicilline, who testified to that here at the hearing. Attorney John M. Cicilline testified that he told petitioner on January 3, 1989 that he would prepare an entry of appearance form on behalf of his father and "give it to Fred Bucci", a friend of petitioner and a part time process server for the Cicilline law offices to give to the petitioner at the Kent County Courthouse on January 4, 1989. Attorney John M. Cicilline recalled that he believed that petitioner told him that he was "going to trial" on January 4th. Alfred J. Bucci, the Fred Bucci referred to by Attorney John M. Cicilline, also testified. Mr. Bucci, a friend of the petitioner, testified that he did deliver the Cicilline entry of appearance form to the petitioner at the Kent County Courthouse on January 4, 1989. He testified also that petitioner had spoken to him on January 3, 1989 at least three times, and that petitioner told him he did not trust Attorney Kelly and that he wanted to hire Attorney John F. Cicilline. Mr. Bucci also testified that in that January 3rd telephone conversation with the petitioner, the petitioner said that it was time to go to trial and that the "trial was going on the 4th." The petitioner's testimony that he was totally unaware of a January 4, 1989 trial date is simply stated, not truthful.
On January 4, 1989 the petitioner, his sister and mother all were present at the Kent County Courthouse. The case was called ready for trial. Attorney Kelly then informed the Court that he was still discussing with his client the State's November 14, 1988 pre-trial conference cooperation recommendation. The State's witnesses were all present for trial and the Court had continued all other trials from the trial call calendar subject to completion of the petitioner's trial.
Shortly after the noon-lunch recess, the Court was informed by the prosecutor and by Attorney Kelly that the petitioner had decided to withdraw his previously entered not guilty pleas and to plead guilty. The prosecutor also informed the Court and Attorney Kelly that no cooperation recommendation would be made. The Court informed counsel that the plea would be an "open ended" plea, without any commitment and without any promises whatsoever with regard to the length or term of any sentences to be imposed. All of the above was clearly stated on the record, to the defendant at the change of plea proceedings. A reading of that proceeding transcript shows in meticulous detail that the defendant-petitioner was completely informed and advised that no sentencing recommendations or promises had been made to or by the Court or the State and that the case, after change of plea, would be continued for pre-sentence report submission and sentence. The defendant-petitioner, as appears from the record of the proceedings, appears to have been totally at ease; totally aware of the proceedings and totally satisfied with Attorney Kelly's representations on the record. After admitting in open court that he did in fact, as charged, make the three cocaine sales to the undercover policeman, Gregory P. Orsini, the Court permitted Mr. Pezzucco to withdraw his previously entered not guilty pleas and to then formally enter his pleas of guilty to each of the three cocaine sale charges. He did. He then thanked the Court (Petitioner's Exhibit p. 11) and the case was then continued until February 15, 1989 for sentencing.
On February 15, 1989 the petitioner was sentenced on each count to a term of thirty years, with twenty years to serve and ten years suspended. In addition he was fined $100,000. The sentences were all made to run concurrent with each other.
Attorney Kelly testified that after the February 15, 1989 sentencing, he visited petitioner at the Adult Correctional Institutions after meeting again with another prosecutor, Radcliffe, and Detective Renn in hopes of still getting the petitioner to cooperate truthfully with the Attorney General's Drug Strike Task Force in return for a State sentence reduction Motion pursuant to § 21-28-4.19 R.I.G.L. The petitioner was then, again interested, and according to Attorney Kelly requested that Attorney Kelly meet once again with the attorney general to find out what could be done. Attorney Kelly testified that he did so, but found little further interest from Prosecutor Radcliffe.
Months later, on December 3, 1989, the petitioner also pleaded guilty to the South Kingstown drug charge in Washington County (W2/88-492). Attorney Kelly, despite some objection by the petitioner, represented him at that disposition.
This Court, after conscientious review and consideration of the Post-Conviction Application hearing testimony and evidence denies the petitioner Kevin Pezzucco's application for Post-Conviction Relief. This Court is totally and absolutely convinced that Mr. Pezzucco has made allegations against his former attorney John J. Kelly which are totally unfounded and false. This Court has heard the testimony of Mr. Pezzucco and of his witnesses as well as that of Mr. Kelly. The Court accepts as credible the testimony of Mr. Kelly and rejects that of Mr. Pezzucco. This Court is of the firm opinion that Mr. Pezzucco is a most deceptive, devious and calculating liar and perjurer. During the course of the post-conviction hearings he repeatedly perjured himself in hope of avoiding the consequences of his previous judicial admissions of guilt. It appears paradoxical as to how he can deny his drug guilt on the Kent County charges and yet appear to be completely satisfied with his drug guilt admissions in the Washington County charges which all stem from the same police investigation and search agenda. However, the paradox is understandable if one reflects upon the delusive nature of Mr. Pezzucco's conduct before, during and after the entry of his guilty pleas. In the Washington County case, the sentences therein imposed were for short terms and were all to be served concurrent with the longer Kent County sentences.
On January 4, 1989, Mr. Pezzucco voluntarily, knowingly and intentionally decided not to proceed to trial on the three Kent County cocaine sales charges. He did so because he knew full well that there was no reasonable possibility that he would be found not guilty by a jury. He knew that he was guilty, and could not obvert the facts. He had been specifically told that by Attorney Kelly long prior to January 4, 1989. His only remaining chance and option to wiggle out of his predicament on January 4, 1989 was to once again try to delude the State's prosecutor by having Mr. Kelly attempt to gain a favorable recommendation from the prosecutor in return for his cooperation. The prosecutor, however, rejected that last minute cooperation ploy because of having been previously deceived by Mr. Pezzucco. Accordingly, Mr. Pezzucco realized that his options had run out and he decided to admit his guilt to the charges and forgo his trial. He had simply run out of corners in which to hide. He pled guilty on January 4, 1989, not because of anything said or done by Mr. Kelly, but instead, simply because he knew full well that he could not win, regardless of who his attorney was. His only way out was to agree to cooperate with the State and become an informant against those persons who were the source of his cocaine supply and that, he was reluctant to do. This Court finds no particular fault with Mr. Pezzucco's ignoble sense of loyalty to his cocaine source friends, but does with his obvert deviousness in this post-conviction proceeding. His testimony during this proceeding, as well as that of some of his witnesses simply denigrates the judicial post-conviction process.
As for the testimony of Attorney Joseph J. Altieri, and that of Constable Alfred J. Bucci, this Court is totally satisfied that each testified truthfully in this proceeding. In circumspect, although each was called to testify by Mr. Pezzucco, the testimony elicited from them actually contradicts Mr. Pezzucco's testimony. Attorney Altieri testified that Mr. Pezzucco knew that on January 4, 1989 that he was going to trial. Attorney Altieri also testified that he warned Pezzucco on the morning of January 4, 1989 that any plea by Pezzucco would be an "open ended plea. Attorney Altieri also recalled being told by Pezzucco that he had a deal and would get a 5 to 10 year sentence if he pleaded. Pezzucco had earlier testified that Attorney Kelly told him the deal was for no more than 3 years.
Constable Bucci's testimony is also interesting when compared to Mr. Pezzucco's testimony. Bucci recalled that Pezzucco told him that Attorney Kelly had said that the sentence would be 5 years.
Margaret Pezzucco, the defendant's mother, as well as his sister Davida Pelosi; his brother-in-law Joseph Pelosi and his former roommate and friend, Kurt Vinacco, a bartender and doorman at Alias Smith Jones Bar in East Greenwich, also testified in the post-conviction proceedings.
Margaret Pezzucco testified that she believed the expected sentences to be 5 to 10 years; Joseph J. Pelosi believed them to be 3 to 10 years or 3 to 5 years and Kurt Vinacco testified that Mr. Pezzucco told him the sentences would be 3 to 10 years.
This Court does not believe the testimony of Margaret Pezzucco; Davida Pelosi; Joseph J. Pelosi and Kurt Vinacco. The Court understands full well their motives in testifying as they did, but does not in any manner condone their motives or their statements made under oath during the course of this proceeding.
An example of the above-noted unacceptable testimony is that of the petitioner's sister, Davida Pelosi. She testified that after her brother had been arraigned on the cocaine sale charges she obtained copies of the police investigation reports. She then related that she showed them to her friends. She testified that all of her friends thought the police reports concerning her brother's drug activities were "funny" and "outlandish". She testified also that the police reports suggested to her "entrapment of her brother" by the police. When asked by the Court if she had ever decided to ask her brother if the police reports and the accusations against him regarding the three cocaine sales were true, she suddenly hesitated, and after a long thoughtful pause, replied, "I can't answer that." Such an answer, under oath, is both interesting and informative when one recalls that it was Davida Pelosi who conceived and conjured up the entrapment defense and discussed it with Attorney Kelly. Inherent in the defense of entrapment is the admission of the commission of the criminal act. Further review of the post-conviction hearing testimony is really not necessary. In manner of denouement, suffice it to say that on Wednesday, June 24, 1992 Kevin Pezzucco testified before this Court that his attorney John Kelly on January 4, 1989 "guaranteed" him that his sentences on three separate delivery of cocaine charges would be no more than 3 years. He also testified that he did not deliver cocaine to Gregory Ursini, the undercover policeman on August 25, 26 and on September 2, 1988 as alleged in the indictment against him.
On January 4, 1989 when Kevin Pezzucco appeared before this Court and requested permission to withdraw his previously entered not guilty pleas to those same three criminal acts and charges, he was specifically asked by the Court if he had in fact delivered the cocaine to Gregory Ursini, and he told the Court that he did. At that same Court proceeding on January 4, 1989, Mr. Pezzucco solemnly assured this Court that "no promises or consideration whatsoever" had been made or given to him, or to his attorney, Mr. Kelly, regarding the sentences to be imposed by the Court on the 3 cocaine delivery charges. (Exhibit 2, pages 2, 7)
I am totally convinced that on the occasion of his January 4, 1989 solemn admissions, Kevin Pezzucco was entirely truthful when he appeared and spoke before this Court. I am equally convinced that on Wednesday, June 24, 1992 when he next appeared and testified before this Court on his post-conviction petition, that he committed deliberate perjury.
This Court is satisfied from its review of the evidence and from the exhibits that Attorney John J. Kelly's representation of Kevin Pezzucco prior to, and during the proceedings at which Mr. Pezzucco entered his guilty pleas far surpassed the required reasonable effective assistance of counsel standard clearly enunciated by the United States Supreme Court in Strickland v.Washington, 466 U.S. 668, 687 (1983). See also, Finello v.State of Rhode Island, 601 A.2d 951 (R.I. 1992). As noted inStrickland, supra, p. 688 and p. 689:
 "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." (688)
 "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." (689)
In this case, Attorney Kelly testified that after having been retained by Pezzucco that he met with Pezzucco and his sister Davida, on at least five or six occasions and with Pezzucco, overall eight to twelve times; that he had telephone conversations with Pezzucco; his sister and father. He also testified that he discussed, considered and rejected the entrapment defense suggested by Pezzucco a statement that Pezzucco claimed he was "conned" into making without having been given his Miranda warnings.
After all was said and done, Attorney Kelly was confronted by what could then be reasonably described as a factual iron clad case against his client. Compare: State v. Figueroa, ___ A.2d ___, (R.I. 3/28/94). Unless he could convince a jury that Gregory Ursini never existed and that the delivered cocaine and later seized drug paraphernalia really was not what it was, Mr. Pezzucco, at trial, was doomed. Attorney Kelly knew that, and so did Mr. Pezzucco. Attorney Kelly, after diligent investigation, did the only thing that could be done to assist Pezzucco. He tried to negotiate a favorable recommendation from the State in return for Pezzucco's cooperation with the Attorney General's Office Narcotic Drug Strike Force. Pezzucco reigned but balked, he reigned and lost out. The plea and sentencing transcript reveals clearly that had he taken and followed Attorney Kelly's recommendation and been truthful, he would not now be crying foul at Attorney Kelly. Attorney Kelly just could not transform what was a horse chestnut into a chestnut horse and let Mr. Pezzucco ride off into the sunset. Mr. Pezzucco received more than reasonable assistance of counsel. His dissatisfaction with his sentence stems not from Attorney Kelly's representation and advice, but instead, from his own reluctance and refusal to follow same. He has no one to blame for his criminal actions and none to blame for his sentence . . . except himself. His application and petition for Post-Conviction Relief is denied.